# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **THOMAS P. CLIFFORD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **No. 08 C 0828** |
| | ) | |
| **PATTERSON COMPANIES, INC.** | ) | **Judge Joan H. Lefkow** |
| **and PATTERSON MEDICAL** | ) | |
| **SUPPLY, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION AND ORDER

Thomas Clifford, a 64-year-old man, filed a three count complaint against defendants,

Patterson Medical Supply, Inc. ("Patterson Medical") and Patterson Companies, Inc. ("Patterson

Companies"), alleging age discrimination and retaliation in violation of the Age Discrimination

in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and retaliation in violation of Title VII

of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2 *et seq.* Before the court are

defendants' motion for summary judgment [#63] on all three of Clifford's claims and Clifford's

motion for partial summary judgment [#60] on ten of defendants' eleven affirmative defenses.

For the following reasons, the motions are granted in part and denied in part.

### RELEVANT FACTS[1]

Clifford was hired by Sammons Preston, Inc. ("Sammons Preston") in February 1997. In

September 2003, Sammons Preston was acquired by Patterson Companies and Clifford assumed

---

[1] The facts set forth in this section are derived from the statements of fact submitted by the parties to the extent they comport with Local Rule 56.1, as discussed *infra* at 14-15. They are taken in the light most favorable to the non-movant, as discussed *infra* at 14.

the position of Vice President of U.S. Sales for Patterson Medical.[2]  Clifford was compensated

with paychecks and bonus checks issued by Patterson Companies.  On two occasions, Patterson

Companies offered Clifford the opportunity to own Patterson Companies stock.  On September

28, 2005, Patterson Companies CEO James Wiltz ("Wiltz") sent Clifford a letter informing him

that he had been awarded 710 shares of restricted stock in Patterson Companies.  Attached to the

letter was a document titled "Guide to Restricted Stock Award."  The guide identified Patterson

Companies as "the Company" and Clifford as "the Employee."  Patterson Guide to Restricted

Stock Award, attached as Ex. 4 to Pl.'s L.R. 56.1 SoF.  On October 17, 2005, Wiltz sent Clifford

another letter inviting him to participate in the Patterson Capital Accumulation Plan ("CAP

Plan"), through which Clifford would receive a portion of his salary in the form of restricted

stock in Patterson Companies.

I.      **Patterson Medical Hires Tenzer**

In the Fall of 2004, Patterson Medical hired Len Tenzer ("Tenzer") to be the Senior Vice

President of Sales, responsible for managing Clifford and several other employees.  When

Clifford met Tenzer for the first time, Tenzer commented on the ages of the individuals in the

sales force and said that Patterson Medical needed to hire younger people.  Tenzer asked about

Sales Representative Kathy Furstnau, wondering why Clifford would hire "somebody like that in

their 40's."  Deposition of Thomas Clifford 58:17-19, Sept. 17, 2008, attached as Ex. 3 to Defs.'

L.R. 56.1 SoF (hereinafter "Clifford Dep.").  Tenzer remarked, "We've got some work to do.

You've got an old guy, Joe Abrass, in Florida.  He needs to be – we need to find a way to get

---

[2] Patterson Medical is a wholly owned subsidiary of Patterson Medical Holdings, Inc., which is a wholly
owned subsidiary of Patterson Companies.

him in another position. You've got – we've got this woman Pat Purser . . . . She should be thinking about retiring. She's older than Abrass." *Id.* 52:24-53:6. Tenzer also said that he wanted to transfer Abrass because of his age, health, and because he believed that Abrass was "too old to do [his] job." *Id.* 65:19-66:8, 69:4-5. Tenzer expressed his desire to hire younger people "several times" after their first encounter. *Id.* 59:11-17.

## II. Clifford's Promotion to and Performance as Vice President of Business Development

On January 3, 2005, Clifford was promoted to Vice President of Business Development. In this role, Clifford was to oversee the Specialty Sales Group ("SSG"), which accounted for approximately ten to fifteen percent of Patterson Medical's sales, to maintain relationships with Patterson Medical dealers, and to facilitate the acquisition of new dealers to grow Patterson Medical's sales of physical therapy products. Clifford continued to report to Tenzer and his salary increased to $135,000 per year.

When Clifford took over, SSG was underperforming. Edward Donnelly ("Donnelly"), then-CEO of Patterson Medical, testified that SSG was the "ugly stepchild of [Patterson Medical's] sales organization" and that "[s]ales were slow. It was low margin. It was not growing." Deposition of Edward Donnelly 31:8, 21-22, Nov. 14, 2008, attached as Ex. 7 to Defs.' L.R. 56.1 SoF (hereinafter "Donnelly Dep.").

On April 5, 2005, Tenzer gave Clifford a performance evaluation. Tenzer gave Clifford an overall rating of "Needs Improvement," a 2 out of a possible 5. In the category of "Execution Competencies," Tenzer gave Clifford a "Needs Improvement" rating as well. Tenzer identified nine performance issues that he was concerned about: (1) Clifford took "little or no action" to resolve key issues with personnel, training, and hiring; (2) he "should have been more effective

in assuming ownership for the [Corporate Accounts Directors ("CADs")] and the sales people in the Western half of the U.S.;" (3) he failed to adequately train Regional Directors in interviewing and performance management; (4) he hired several poor performers in the past year; (5) he did not deal with poor performing sales representatives in a "timely or objective manner;" (6) he improperly left pricing and analysis tasks to his CADs; (7) he provided "minimal direction" to two of his CADs; (8) his CADs did not all provide adequate customer service and one customer "loudly complained;" and (9) he failed to effectively coach and/or train Dave Hensley, despite spending "considerable time" with Hensley. *See* Clifford Dep., Ex. 28. Clifford disputes the authenticity of the evaluation, claiming that "it was supposed to be revised," and that "Tenzer told [him] that he would redo it." Pl's Resp. to Defs.' L.R. 56.1 SoF ¶ 24.[3]

Six months after the review, in October 2005, Tenzer commented about Clifford's age for the first time. Tenzer remarked, "I can't believe you're that old. I can't believe you're that old . . . . Are you really that old? I saw in your record how old you are. I can't believe how old you are. What's your age?" Clifford Dep. 47:18-48:18.

Despite previously slow sales, under Clifford's supervision, SSG achieved an average of 5.5% gross profit growth for the 2005 calendar year.[4] In the third quarter of 2005 (June through September), SSG achieved 3.4% gross profit growth, however, in the fourth quarter of 2005 (October through December), gross profit growth was -16.1%. Sales for the first quarter of 2006 (January 2006) were also slow, and SSG's gross profit growth was -15.1%.

---

[3] Clifford does not specify which parts of the review were inaccurate or otherwise indicate which parts Tenzer was going to revise.

[4] SSG's performance was measured in terms of gross profit growth. Patterson Medical imposed company-wide gross profit growth goals that varied by product line, ranging from 7.5% to 11%.

## III.     The Medtrade Convention

In October 2005, Dave Sproat ("Sproat") took over for Donnelly as President of Patterson Medical.  Donnelly testified that at the time he left, he "thought [Clifford] was doing a very, very good job. . . . [He] was very pleased with his performance."  Donnelly Dep. 115:23-116:2.  That month, Sproat, Clifford, Tenzer, and other Patterson Medical employees attended a convention for companies in the medical field.  Clifford contends that Sproat behaved inappropriately one night during the convention, though he did not personally observe any of Sproat's behavior.  The following morning, Clifford told Tenzer about Sproat's alleged behavior.  Clifford told Tenzer that Sproat insulted someone, that Sproat asked two female Patterson Medical employees to accompany Sproat to his hotel room at 3:00 a.m., and that the female employees were afraid and extremely uncomfortable.  Clifford Dep. 101:13-102:7, 115:12-116:12, 118:18, 119:1.  He also told Tenzer that "several" regional managers complained to him about Sproat's behavior as well.  *Id.* 142:16.

When Tenzer returned from the conference, he relayed Clifford's comments to Mary Jean Schlueter ("Schlueter"), head of Human Resources for Patterson Medical, and Patterson Companies' in-house attorney, Carol Halley ("Halley").  Thereafter, Halley initiated an investigation into Clifford's comments.

## IV.     The Patterson National Sales Meeting

In January 2006, Clifford, Tenzer, Sproat, and several other Patterson Medical employees attended a national sales meeting in Chicago.  At the meeting, Tenzer told Clifford that he believed SSG was performing "very well."  Clifford Dep. 158:11-12.  Tenzer also spoke with

Clifford about his retirement plans, asking him "when [he] wanted to retire; why [he was not] retiring," and stating that Clifford "should have enough money to retire." *Id.* 90:5-8.

Sproat again behaved inappropriately at the meeting and Clifford reported the behavior to Tenzer. Clifford told Tenzer that four Patterson Medical employees complained to him that Sprout behaved inappropriately. Clifford Dep. 151:8-12. He told Tenzer that he received reports of "kissing and groping," reports that Sproat placed a finger in the mouth of a female Patterson Medical employee, and reports that Sproat followed another female Patterson Medical employee into the women's restroom. *Id.* 265:20-266:3. When Tenzer returned from the meeting, he relayed Clifford's comments to Schlueter and Halley, and Halley initiated another investigation.

In February or March 2006, Clifford called Tenzer to ask about Halley's investigations. Tenzer told Clifford that Halley completed both investigations and that she found his complaints from October 2005 and January 2006 to be meritless. During this conversation, Tenzer referred to Clifford as the "ringleader" of all complaints against Sproat. Clifford Dep. 161:8-11. Tenzer told Clifford that he believed that the complaints against Sproat were brought by people who were loyal to Donnelly, who had retired a few months earlier. *Id.* 161:11-162:12.

## V.    Clifford's Demotion

In early March 2006, Tenzer and Clifford had a conversation in which Tenzer asked Clifford how long he planned to continue working. Tenzer admits that at that time, he no longer wanted Clifford to be the Vice President of Business Development but that he would have let Clifford remain in the position if Clifford planned to retire in the near future. Tenzer also told Clifford that he was thinking of transferring him to a National Accounts Director ("NAD")

position. When Tenzer spoke about the possible transfer, Tenzer remarked that "for a person [Clifford's] age, the [NAD position] should be easy" and that "for a person [Clifford's] age, [it] would be a good job." Clifford Dep. 95:1-3. Tenzer also said that Clifford "was old enough now that [he] should be looking at the job transfer as something that would be easier." *Id.* 94:20-95:1. When the two discussed the $15,000 reduction in salary incidental to the transfer, Clifford objected to the reduction and Tenzer responded, "Well, Tom, at your age . . . ." *Id.* Tenzer did not mention any specific performance-related reasons for the possible transfer. This was the only conversation that Clifford and Tenzer had about the transfer.

On March 29, 2006, Tenzer notified Clifford that he was transferring Clifford from his role as Vice President of Business Sales to a NAD position, effective May 1, 2006. Tenzer testified that his decision to transfer Clifford was primarily based on four reasons: (1) SSG performed poorly during the 2006 fiscal year; (2) Clifford had minimal impact on local dealers for potential acquisitions; (3) Clifford failed to put Specialty Sales Manager Dave Hensley on a Performance Improvement Plan ("PIP") despite Hensley's unsatisfactory performance; and (4) Clifford failed to hire a California-based Specialty Manager. Tenzer Dep. 260:13-261:10, 270:16-271:16, 275:14-276:8, 279:11-20, 281:20-283:21. Tenzer did not articulate any of these reasons to Clifford at the time of his demotion. In July 2007, Tenzer informed Clifford that his demotion was a result of poor profit growth in SSG during the 2006 fiscal year. He did not mention any of the three additional reasons listed above.

Clifford identifies four individuals, Agnes Cominsky, Val Brown, Diane Scheuer, and Patrick Masterson, who each received evaluations similar to Clifford's April 2005 evaluation.

He claims that none of these individuals ever complained to Tenzer about Sproat's allegedly inappropriate behavior and that none of them has ever been demoted.

Agnes Cominsky is a Regional Director for Patterson Medical who reports to Tenzer. In 2007, Tenzer gave Cominsky a performance rating of "Needs Improvement," 2 out of a possible 5, in the "Execution Competencies" category. Tenzer noted that Cominsky's region had the lowest gross profit growth of all Patterson Medical regions in 2007 and that Cominsky often failed to turn in monthly reports on time. In her 2008 evaluation, Tenzer again noted that she did not always turn in reports on time. Cominsky has never been demoted for these performance issues.[5]

Val Brown, a Regional Director for Patterson Medical, also reports to Tenzer. In 2007, Tenzer gave Brown a performance rating of "Needs Improvement," 2 out of a possible 5, in the "Execution Competencies" category. Tenzer noted that in 2007, Brown's region's gross profit dollar growth was one of the lowest of all Patterson Medical regions. He also noted that Brown routinely failed to complete reports and assignments in a timely manner. Brown has never been demoted for these performance issues.

Diane Scheuer is a NAD for Patterson Medical who reports to Tenzer. In 2005, Tenzer gave Scheuer a performance rating of "Meets Expectations," 3 out of a possible 5, in the "Execution Competencies" category. Tenzer noted that she did not meet her calendar year profit

---

[5] Contrary to Clifford's claim, Cominsky testified that she spoke with Tenzer at the Patterson Medical sales meeting in January 2006 about Sproat's behavior. Deposition of Agnes Ann Cominsky, 112:16-113:11, Oct. 28, 2008, attached as Ex. 6 to Defs.' Mot. for Summ. J. (hereinafter "Cominsky Dep."). She specifically testified that she told Tenzer that some of her representatives "felt uncomfortable" about it. *Id.* 113:9-11.

growth goal and that on a few occasions she was slow to follow up on customer complaints and requests. Scheuer has never been demoted for these performance issues.

Patrick Masterson is a National Accounts Manager for Patterson Medical who reports to Tenzer. In 2005, Tenzer gave Masterson a performance rating of "Needs Improvement," 2 out of a possible 5, in the "Execution Competencies" category. Tenzer noted that Masterson's region performed worse than years prior and that it was below company goals. In Masterson's 2006 evaluation, Tenzer again gave Masterson a rating of "Needs Improvement," 2 out of a possible 5, in the "Execution Competencies" category. Tenzer noted that in 2006, gross profit dollar growth in Masterson's region was one of the lowest of all Patterson Medical regions and that his region had several sales reps who were not performing well. Masterson has never been demoted for any of these performance issues.[6]

## VI.    Events Leading up to Clifford's Resignation

In May 2006, Clifford began working as a NAD, overseeing sales to a segment of Patterson Medical's national accounts. Tenzer did not provide Clifford with a written job description, nor did he provide him with a written set of performance expectations. Also in May 2006, Tenzer removed him from a NAD email list and denied him access to Patterson Medical's computer system, which made it impossible for him to see "usages, pricing, account activity, anything that would have to do with being able to run a territory or – or do a job." Pl.'s Additional L.R. 56.1 SoF ¶ 87. Clifford does not specify how long he was denied access, but he

_____

[6] Contrary to Clifford's claim, Masterson testified that he spoke with Tenzer at the Patterson Medical sales meeting in January 2006 about Sproat's behavior. Deposition of Patrick Masterson, 70:16-71:15, Nov. 11, 2008, attached as Ex. 8 to Defs.' Mot. for Summ. J. (hereinafter "Masterson Dep."). He specifically testified that he told Tenzer that Sproat looked like he had too much to drink one night. *Id.*

was able to access at least some account information in June and July and was still able to send emails at all relevant times.

At some point after his demotion, Tenzer called Clifford at home and left him voice mails threatening to fire him. In these voice mails, Tenzer told him that he had a limited number of days left at Patterson Medical, essentially conducting a "countdown wherein he stated that [Clifford] had 30 days of employment left, then 20 days left, then 15 days." Pl.'s Resp. to Defs.' Mot. for Summ. J. at 5.

On July 7, 2006, Tenzer spoke with Clifford about his performance in his first months as a NAD, specifically expressing concern about Clifford's lack of customer contact. On July 11, 2006, Tenzer sent Clifford a follow up email stating that Clifford "continue[d] to have minimal direct contact with [his] customers" and noted that Clifford was not communicating with him, other NADs or his field sales representatives. *See* Clifford Dep., Ex. 34. Tenzer also expressed concern that Clifford did not have a business plan and asked him to submit one by July 24, 2007. Tenzer warned Clifford that "[w]ithout a significant change in [his] performance, [his] employment [would] be terminated from the company." *Id.*

On July 17, 2006, Tenzer sent Clifford another email in which Tenzer criticized Clifford for telling a customer to "short pay" an invoice, which would have allowed the customer to receive an unapproved discount on a Patterson Medical product. *See* Clifford Dep., Ex. 35. Tenzer stated that it was "totally inappropriate" to suggest that the customer short pay the invoice and stated that the suggestion was "just another example of the concerns" he had with Clifford's performance. *Id.*

On the same day, Clifford met with Schlueter to remind her that he had made two sexual harassment complaints to Tenzer regarding Sproat's behavior but that nothing had been done about them. He also told her that Tenzer discriminated against him on the basis of his age while he was a Vice President and when he was demoted. He told her that Tenzer made age-biased comments about him and other employees, including Purser and Abrass, while he was still employed as a Vice President, and said that Tenzer had frequently brought up his age in the previous ten months. Finally, he asked Schlueter for "protection" from Tenzer because Tenzer's allegedly excessive and unwarranted criticism made it "absolutely unbearable [for him] and impossible for [him] to do [his] job." Clifford Dep. 295:13-16.

On July 19, 2006, Tenzer sent Clifford an email regarding the Babeskin Body Care account. Tenzer explained that the contact at Babeskin was frustrated with Clifford's "lack of service," because he had "called [Clifford] numerous times and only on a couple of occasions did [Clifford] even return his call." Tenzer Dep., Ex. 13. The contact requested that "[d]ue to [Clifford's] unresponsiveness, . . .[Tenzer] assign a different person to call on him." *See* Exhibit 13 to Tenzer Dep., attached as Ex. F to Pl.'s Resp. to Def's L.R. 56.1 SoF (hereinafter "Tenzer Dep., Ex. 13."). Clifford responded in an email stating that the contact frequently called him because he wanted better terms on his contract, which Clifford knew he could not provide. Clifford further stated that "[i]f [the contact] requests a price that [is] within reason, [he would] make a change," however, he ended the email stating that Babeskin was "currently not [his] account." Tenzer Dep., Ex. 13. Clifford maintains that Babeskin was not his account and that he always returned the contact's calls or referred him to an appropriate person.

On July 27, 2006, Clifford filed a charge of age discrimination and retaliation with the EEOC. On July 28, 2006, Tenzer sent Clifford a letter, again criticizing Clifford's performance. Tenzer indicated that Clifford needed to "immediately demonstrate dramatic improvement in the frequency of [his] contact with [his] customers" because "[m]eeting with only a couple accounts per month is unacceptable." Clifford Dep., Ex. 39. Tenzer also expressed concern that Clifford did not know how to do a business plan but stated that he needed to produce one by August 9, 2006. *Id.* Clifford emailed Tenzer a business plan on August 8. In his email, he called Tenzer's request for a business plan "just another form of harassment, since no one else in the National Accounts group has been made to do one." Clifford Dep., Ex. 40.

On August 25, 2006, Clifford emailed Tenzer's secretary that he was not going to attend that day's conference call or a September 6-7 Regional Directors' meeting because he was going on vacation. Tenzer called Clifford twice that day but could not reach him. At the end of the day, Tenzer sent Clifford an email and overnight letter stating that it was unacceptable for him to miss the conference call and the meeting without providing earlier and direct notice to Tenzer. Tenzer also articulated his concern that one of Clifford's customers had not heard from Clifford. Tenzer stated that the customer called to ask whether it had a sales representative at all. He asked Clifford to call him by 9:30 a.m. on August 28. Clifford emailed Tenzer on August 28, stating that he had only been informed of the conference call on August 24, that he had a scheduled doctor's appointment for August 25, and that he had a family commitment on September 6 and 7. He further stated that he believed "[Tenzer's] displeas[ure] with [him] [came] from the fact that [Tenzer] failed to follow company policy in regards to the complaints

[Clifford] brought to [him]," and that "[Tenzer's] harassment is unwarranted and retaliatory." Clifford Dep., Ex. 45.

On September 1, 2006, Tenzer called Clifford and reiterated his concerns about Clifford's lack of customer contact and failure to participate in company meetings. Tenzer sent Clifford a follow-up letter summarizing these concerns a week later. On September 14, 2006, Tenzer wrote Clifford another email, in which he criticized Clifford for failing to contact a customer from the Medline account and stated that the lack of contact was "yet another example of [Clifford's] unacceptable performance." Clifford Dep., Ex. 47. Clifford claims that he was not responsible for the Medline account and therefore that Tenzer's criticism was unfounded. One day later, on September 15, 2006, Clifford resigned from Patterson Medical.

**VII.    Events Following Clifford's Resignation**

The weekend of September 15, 2006, Clifford received an offer of employment at Scrip Products Corporation ("Scrip"). Clifford accepted the offer on September 17, 2006. On October 26, 2006, Halley, in-house counsel for Patterson Companies, sent Clifford's attorney a letter stating that Clifford owed continuing obligations to Patterson Companies, including an obligation to return any confidential information that he obtained during his employment and an obligation to refrain from making disparaging or negative statements about Patterson Companies. In July 2007, Halley submitted a position statement on behalf of defendants in response to Clifford's EEOC charge.

**LEGAL STANDARD**

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P.

56(c).  To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record.  Fed. R. Civ. P. 56(c) advisory committee's notes.  The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact.  *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  In response, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial.  *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000).  A material fact must be outcome determinative under the governing law.  *Insolia,* 216 F.3d at 598-99.  Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the non-moving party as well as view all reasonable inferences in that party's favor.  *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  On cross-motions for summary judgment, the court must consider the merits of each motion and assess the burden of proof that each party would bear on an issue at trial.  *Santaella* v. *Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997).

Northern District of Illinois Local Rule 56.1(a) requires the party seeking summary judgment to submit, among other things, a statement of material facts, which consists of short, numbered paragraphs and specific references within each paragraph to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph. L.R. 56.1(a)(3).  The nonmoving party must then submit a concise response to the movant's

statement of facts. *Id.* Material facts improperly denied by the nonmoving party are deemed admitted by the court. *Id.*

## ANALYSIS

Before reaching the merits of the motions for summary judgment, the court will address certain deficiencies in Clifford's response to defendants' Rule 56.1 Statement of Uncontested Facts. The court agrees with defendants that Clifford's responses to ¶¶ 2, 8, 11, 13, 14, 24, 32, 33, 36, 39, 44, 45, 47-49, 51, 52, 57, 58, 61, 63, 64, 66, and 67 are improper because they are not properly supported with citations to the record. *See Smith* v. *Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("[A] mere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material."). Because the court is entitled to expect strict compliance with Local Rule 56.1 procedures, *Ammons* v. *Aramark Unif. Servs, Inc.*, 368 F.3d 809, 817 (7th Cir. 2004), it deems these paragraphs admitted. *See Cady* v. *Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006) (explaining that it is inappropriate to make legal arguments in Rule 56.1 statements and responses); *Smith*, 321 F.3d at 683 (ruling that the district court acted within its discretion when it deemed defendant's statement of facts admitted because the plaintiff failed to support controverted or additional facts with citations to admitted evidence); *Jupiter Aluminum Corp.* v. *Home Ins. Co.*, 225 F.3d 868, 871 (7th Cir. 2000) ("An answer that does not deny the allegations in the numbered paragraph with citations to supporting evidence in the record constitutes an admission."); *Markham*, 172 F.3d at 490 (ruling that the district court acted within its discretion when it disregarded depositions and other discovery materials that appeared only in the defendant's supporting brief); *Waldridge* v. *Am. Hoechst Corp.*, 24 F.3d 918, 924

(7th Cir. 1994) (ruling that district court acted within its discretion in granting summary judgment to defendant based on plaintiff's failure to comply with Local Rule 56.1).

## I.     Clifford's Motion for Partial Summary Judgment

Clifford moves for partial summary judgment on ten of defendants' eleven affirmative defenses. According to Fed. R. Civ. P. 56(d), partial summary judgment provides for a situation where judgment is on some but not all claims. Fed. R. Civ. P. 56(d). A motion for partial summary judgment that parses a claim for relief into different parts and seeks judgment on some but not all of those parts is not permitted. *Capitol Records, Inc.* v. *Progress Record Distr., Inc.*, 106 F.R.D. 25, 28 (N.D. Ill. 1985). "Where a party seeks judgment on a complete affirmative defense . . . courts in the Northern District of Illinois routinely entertain motions for partial summary judgment." *Rubin* v. *Islamic Republic of Iran*, 408 F. Supp. 2d 549, 552 (N.D. Ill. 2005) (collecting cases). "[T]he basic concept of an affirmative defense is an admission of the facts alleged in the complaint, coupled with the assertion of some other reason defendant is not liable." *Instituto Nacional de Comercializacion Agricola* v. *Ill. Nat'l Bank & Trust Co.*, 576 F. Supp. 985, 989 (N.D. Ill. 1983). Consequently, commentators encourage motions for partial summary judgment on affirmative defenses because they provide a means to expedite and simplify a case for trial. *See* 10B Wright, Miller & Kane, Federal Practice and Procedure § 2737 (3d ed. 1998). Because Clifford's motion seeks judgment on ten complete affirmative defenses and because resolution of the motion promotes judicial economy, the court will decide the merits of the motion.

Clifford seeks summary judgment on defendants' eighth affirmative defense, which asserts that Patterson Companies is not a proper defendant because it was not Clifford's employer during the relevant time period. Clifford argues that Patterson Companies was his "joint employer" and as such, is a proper defendant.

"The joint employer concept . . . looks to the control two separate companies exert over the same employee." *Nat'l Labor Relations Bd.* v. *W. Temp. Servs., Inc.*, 821 F.2d 1258, 1266 (7th Cir. 1987). It is generally used "to obtain jurisdiction over a company that is unrelated to the employer-in-fact but which exercises sufficient day-to-day control over a charging party to be treated as a co-employer of the charging party." *Brown* v. *Innovative Sys. Group, Inc.*, No. 06-C-1702, 2007 WL 2198347, at *2 (N.D. Ill. July 26, 2007) (internal quotations marks omitted). In the Seventh Circuit, the question of whether the joint employer theory applies to discrimination cases is unsettled. *See Alexander* v. *Rush N. Shore Med. Ctr.*, 101 F.3d 487, 493 n. 2 (7th Cir. 1996) ("We continue to leave open the question [of] . . . whether an employee of employer *X* may bring a Title VII action against employer *Y* when *Y* is not his employer, but merely someone whose discriminatory conduct interferes with his employment with employer *X*." ). A few district courts have recognized a joint employer theory in a specific factual scenario: where an employee is officially employed by a temporary agency, works for a placement employer, and brings a discrimination claim against the placement employer. *See Piano* v. *Ameritech/SBC*, No. 02-C-3237, 2003 WL 260337, at *5 (N.D. Ill. Feb. 5, 2003) ("This court concludes that the joint employer theory should apply in cases in which an individual is employed by a temporary employment agency, but suffers discrimination by the employer to which he or she is assigned, where that employer exerts a significant amount of control over the

individual."); *Brown* v. *City of N. Chi.*, No. 04-C-1288, 2006 WL 1840802, at *5-6 (N.D. Ill. June 28, 2006) ("The joint employer theory of liability is equally applicable in the context of Title VII and the ADA. . . . To hold otherwise would be to permit an employer that would otherwise be subject to the ADA to avoid liability for its discriminatory conduct while maintaining control over the employees to which it was assigned merely by virtue of their status as temporary employees. Such a result would conflict with the remedial purposes of the anti-discrimination statutes . . . .").

Clifford argues that Patterson Companies was his joint employer because Patterson Companies (1) issued his paychecks and bonus checks, (2) awarded him company stock, (3) referred to him as a Patterson Companies employee in a restricted stock agreement, (4) invited him to participate in the CAP Plan, and (5) informed him that he had obligations of confidentiality and non-disparagement. He also relies on the fact that in-house counsel for Patterson Companies prepared defendants' position statement in response to his EEOC charge. Clifford argues that these facts, considered in the context of *Piano* and *Brown*, mandate a decision in his favor. Defendants argue that the two cases are factually distinct from the case at bar and further argue that Clifford has not demonstrated that Patterson Companies exercised the requisite control over Clifford to be considered his joint employer.[7]

_____

[7] Defendants articulate several other arguments under the "single employer" theory, an alternative theory under which an employee can hold a parent company liable for the discriminatory acts of its subsidiary. *See Papa* v. *Katy Indus.*, 166 F.3d 937, 940-41 (7th Cir. 1999). Because Clifford expressly disclaims any reliance on such a theory, however, the court need not address defendants' additional arguments. *See* Pl.s' Resp. to Defs.' Mot. for Summ. J. at 7 ("Defendants' contentions that [plaintiff] cannot pierce the corporate veil, or establish the 'integrated enterprise test,' even if true, miss the mark. Indeed, [plaintiff] did not plead derivative liability against [defendants].").

*Piano* and *Brown*, as previously noted, both involve temporary employees that brought discrimination claims against placement employers, arguing that their temporary agency should have been liable as a joint employer because it exercised significant control over their employment. Here, by contrast, the two entities in question have a parent-subsidiary relationship and Clifford does not even offer an argument that Patterson Companies exercised control over his employment. The evidence on which he relies focuses on the extent to which Patterson Companies provided administrative and legal assistance to Patterson Medical. It does not demonstrate that Patterson Companies exercised any control over Clifford's daily activities or workload. Furthermore, Clifford admits that "Patterson Medical appears to have directed [his] work." Pl.'s Resp. to Defs.' Mot. for Summ. J. at 6. Because Clifford fails to produce evidence demonstrating that Patterson Companies was his joint employer, it is not a proper party and must be dismissed.[8] The court will address the remaining affirmative defenses concurrently with its analysis below.

## II.      Clifford's Age Discrimination Claim

Clifford may establish age discrimination under the ADEA using the direct or the indirect method of proof. *Huff* v. *UA-RCO, Inc.*, 122 F.3d 374, 379 (7th Cir. 1997). Under the direct method, Clifford must establish through direct or circumstantial evidence that "[his] employer's decision to take [an] adverse job action was motivated by an impermissible purpose." *Adams* v. *Wal-Mart Stores*, 324 F.3d 935, 938-39 (7th Cir. 2003). "[D]irect proof of discrimination is not limited to near-admissions by the employer that its decisions were based on a proscribed

---

[8] This conclusion also resolves in defendants' favor Clifford's motion for summary judgment on the second and ninth affirmative defenses, both of which address whether Patterson Companies is a proper defendant in the instant case.

criterion (*e.g.,* 'You're too old to work here.') but also includes circumstantial evidence which suggests discrimination albeit through a longer chain of inferences." *Luks* v. *Baxter Healthcare Corp.*, 467 F.3d 1049, 1052 (7th Cir. 2006) (internal quotation marks omitted) (citing *Sylvester* v. *SOS Children's Vills Ill., Inc.*, 453 F.3d 900, 903 (7th Cir. 2006)). "The indirect method of proof involves a subset of circumstantial evidence (including the disparate treatment of similarly situated employees) that conforms to the prescription of *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 702, 802 (1973)." *Id.* Clifford argues that he can establish age discrimination through both methods. Because Clifford raises a genuine issue of material fact under the direct method, however, the court need not address his indirect method arguments.

### A. Adverse Employment Action

To make out a *prima facie* case of age discrimination under the direct method, Clifford must first establish that he suffered an adverse employment action. *Adams*, 324 F.3d at 938-39. Clifford contends that he suffered adverse employment actions both when he was demoted and when he resigned, characterizing his resignation as a constructive discharge. Clifford's demotion qualifies as an adverse employment action. *See Crews* v. *City of Mount Vernon*, 567 F.3d 860, 869 (7th Cir. 2009) ("[M]aterially adverse employment actions include . . . demotion[s] accompanied by a decrease in pay . . . ."). Whether his resignation qualifies as a constructive discharge and, consequently, an adverse employment action, must be addressed.

"Constructive discharge, like actual discharge, is a materially adverse employment action." *EEOC* v. *Univ. of Chi. Hosps.*, 276 F.3d 326, 331 (7th Cir. 2002). To demonstrate that he was constructively discharged, Clifford must "show that [he] was forced to resign because [his] working conditions, from the standpoint of the reasonable employee, had become

unbearable." *Id.* Working conditions must be more than just unbearable; they must be

unbearable because of impermissible discrimination. *Bennington* v. *Caterpillar Inc.*, 275 F.3d

654, 660 (7th Cir. 2001) (citing *Simpson* v. *Borg-Warner Auto., Inc.*, 196 F.3d 873, 877 (7th Cir.

1999)); *Drake* v. *Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 886 (7th Cir. 1998). Indeed,

"[m]ore than ordinary discrimination is necessary to establish a constructive discharge claim; in

the 'ordinary' case, an employee is expected to remain employed while seeking redress." *Drake*,

134 F.3d at 886; *see Tutman* v. *WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000)

("Working conditions for constructive discharge must be even more egregious than the high

standard for hostile work environment . . . .").

Clifford argues that he was subjected to intolerable working conditions sufficient to

support a finding of constructive discharge from the moment he was demoted to the NAD

position until his resignation. In support of his claim, he notes that Tenzer did not give him a job

description or a written set of expectations and that Tenzer repeatedly asked him to submit a

business plan even though he did not ask other NADs to do so. Clifford also relies on his

allegations that Tenzer removed him from an email list, that Tenzer blocked him from a

company database, that Tenzer made harassing phone calls, and that Tenzer subjected him to

frivolous and excessive criticism. He argues that none of the emails Tenzer sent him in July and

August were justified, claiming that Tenzer invented performance issues in order to harass him.

At most, Clifford experienced boorish behavior by Tenzer, *e.g.*, unjustified criticism,

workplace restrictions, excessive counseling, and a few harassing phone calls. *See Patton* v.

*Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 339 (7th Cir. 2002) ("Many employees have to put up

with some amount of rude, arrogant, or boorish behavior at work . . . ."). This kind of conduct is

insufficient to create a genuine issue as to constructive discharge. *See, e.g.*, *Patton*, 276 F.3d at 339 (affirming summary judgment for employer because rude, overbearing, critical behavior by a supervisor did not create intolerable working conditions establishing constructive discharge); *Simpson*, 196 F.3d at 877 (stating that unpleasant conditions such as arbitrary reprimands, exclusion from office activities, lack of supervisor support, denial of a flex-time request, and harassing phone calls did not give rise to a claim of constructive discharge); *Harriston* v. *Chi. Tribune Co.*, 992 F.2d 697, 705 (7th Cir. 1993) (affirming summary judgment for employer where employee received arbitrary reprimands, was excluded from office activities, experienced some workplace restrictions, was assigned to a different sales territory, and was deprived of supervisor support).

Moreover, in cases finding constructive discharge, plaintiffs suffer not only from more severe and sustained harassment, but also from harassment targeted at a particular protected characteristic. *See, e.g.*, *Taylor* v. *W. & S. Life Ins. Co.*, 966 F.2d 1188, 1191 (7th Cir. 1992) (finding constructive discharge where the plaintiffs' boss constantly peppered the plaintiffs with racist comments, brandished a pistol, and held it to one plaintiff's head); *Brooms* v. *Regal Tube Co.*, 881 F.2d 412, 423-24 (7th Cir. 1989) (finding constructive discharge where "repeated instances of grossly offensive conduct and commentary" culminated with an incident during which a co-worker showed the plaintiff a racist pornographic photograph, told her that she was hired to perform the task depicted in the photograph, grabbed the plaintiff and threatened to kill her. Although Tenzer may have made Clifford's situation difficult, the criticisms and demands Tenzer made were by and large performance-related and cannot be fairly interpreted as intolerable or targeted at his age. Because Clifford cannot link his allegedly intolerable working

conditions to any discriminatory bias, his constructive discharge claim must fail.[9]  *See*

*Bennington* v. *Caterpillar Inc.*, 275 F.3d 654, 660 (7th Cir. 2001) (holding that the plaintiff

failed to show constructive discharge because he failed to link the conditions of his employment

to any age-related bias on the part of his employer).  Accordingly, Clifford may only rely on his

demotion as an adverse employment action in the context of his discrimination claim.

**B.     Circumstantial Evidence of Age Discrimination**

Under the direct method, once a plaintiff proves that he suffered an adverse employment

action, he must present direct or circumstantial evidence that the action was motivated by a

discriminatory purpose.  Circumstantial evidence "need not necessarily take the form of a

convincingly rich mosaic; it is enough that the circumstances give rise to a reasonable and

straightforward inference that the employer has relied on a proscribed factor in taking action

against the employee."  *Luks*, 467 F.3d at 1053.  While "isolated comments that are no more than

'stray' remarks in the workplace are insufficient to establish that a particular decision was

motivated by discriminatory animus," *Merillat* v. *Metal Spinners, Inc.*, 470 F.3d 685, 694 (7th

Cir. 2006), a remark can provide an inference of discrimination when it was (1) made by the

decision maker or one having input on the employment decision in question, (2) made around the

time of the decision, and (3) in reference to the adverse employment action complained of.  *Id.*

In short, Clifford must show that a decision maker expressed discriminatory feelings around the

time of and in reference to his demotion.  *Gorence* v. *Eagle Food Ctrs.*, 242 F.3d 759, 762 (7th

Cir. 2001) (citing *Hunt* v. *City of Markham, Ill.*, 219 F.3d 649 (7th Cir. 2000)).

---

[9] Clifford moves for summary judgment on defendants' fourth, fifth, and seventh affirmative defenses, all of which address damages arising out of his constructive discharge claim.  Because the court has determined that Clifford was not constructively discharged, these affirmative defenses are moot, and the court need not address Clifford's motion as it relates to these affirmative defenses.

Clifford relies on circumstantial evidence to prove his age discrimination claim, pointing to Tenzer's remarks about Purser and Abrass in the fall of 2004, his remarks about Clifford's age in October 2005, and his remarks about Clifford's age and ability to do his job during the March 2006 demotion discussion. His argument focuses on the remarks made during the demotion discussion, in which Tenzer asked Clifford how long he planned to continue working and repeatedly referenced Clifford's age as a reason why the demotion would ultimately benefit Clifford. Specifically, Tenzer told Clifford that "for a person [his] age, the [NAD position] would be "easy" and " a good job," and that he "was old enough now that [he] should be looking at the job transfer as something that would be easier." Clifford Dep. 94:20-95:3. Defendants contend that these remarks are not evidence of age discrimination, but rather, evidence of Tenzer's intention to plan for the future of Patterson Medical. They argue that Tenzer was justified in asking Clifford about his plans for retirement, as Tenzer had a legitimate interest in succession planning, and that his comments evidence nothing more than a desire to advance that interest.

An inquiry as to an employee's plans for retirement is not by itself direct evidence of age discrimination. *See Pitasi* v. *Gartner Group, Inc.*, 184 F.3d 709, 714-15 (7th Cir. 1999) (commenting about early retirement is not direct evidence of discrimination); *Colosi* v. *Electri-Flex Co.*, 965 F.2d 500, 502 (7th Cir. 1992) (asking about retirement plans in general is not direct evidence of discrimination). Tenzer, however, did more than ask Clifford about his plans for the future. He also justified his decision to demote with Clifford's age. Tenzer's several age-related comments can be viewed as a mindset that informed his judgments about the abilities of his employees. Moreover, Tenzer's comments indicate that he believed Clifford's age was

relevant to his salary, job performance, and his ability to handle responsibility. Tenzer was the decision maker with respect to Clifford's demotion and made these remarks in a conversation specifically addressing the demotion, only a few weeks before it actually took place. The remarks therefore create a genuine issue as to whether Clifford was demoted because of his age. *See Volovsek* v. *Wis. Dep't of Agric., Trade, and Consumer Prot.*, 344 F.3d 680, 690 (7th Cir. 2003) (ruling that a comment by supervisors that they were "keeping [women] barefoot and pregnant," overheard moments after the contested employment decision, was "so close in time and in substance" to the decision as to preclude summary judgment). Accordingly, defendants' motion for summary judgment on Clifford's age discrimination claim must be denied.[10]

### C.      Defendants' Third Affirmative Defense

Clifford moves for summary judgment on defendants' third affirmative defense, which asserts that Clifford's age discrimination claim may be barred by the applicable statute of limitations. Under the ADEA, plaintiffs are required to file a charge of discrimination with the EEOC within 300 days of an alleged unlawful employment practice. 42 U.S.C. § 2000e-5(e)(1). As discussed, the only alleged unlawful employment practice that Clifford can rely on is his demotion, which took place in May 2006. Clifford filed a charge with the EEOC on July 27, 2006, well within the 300-day time limit. Accordingly, there is no statute of limitations problem and the court grants summary judgment to Clifford on defendants' third affirmative defense.

### III.      Clifford's Retaliation Claims

---

[10] This conclusion also resolves in Clifford's favor his motion for summary judgment on defendants' first affirmative defense, failure to state a claim upon which relief may be granted.

Clifford contends that he was retaliated against for complaining about Sproat's allegedly inappropriate behavior in October 2005 and January 2006, which Clifford characterizes as sexual harassment.[11] Claims for retaliation under Title VII may be proven indirectly or directly. *Rhodes* v. *Ill. Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004). Clifford argues that he can establish retaliation through both methods, however, because he raises a genuine issue of material fact under the indirect method, the court need not address his arguments under the direct method.

Under the indirect method, Clifford must first make out a *prima facie* case by showing that "(1) [he] engaged in statutorily protected activity; (2) [he] was performing his job according to [his] employer's legitimate expectations; (3) [he] suffered a materially adverse employment action; and (4) [he] was treated less favorably than similarly situated employees who did not engaged in statutorily protected activity." *Hilt-Dyson* v. *City of Chi.*, 282 F.3d 456, 465 (7th Cir. 2002). If Clifford establishes these elements, the burden shifts to defendants to come forward with a "a legitimate, noninvidious reason for the adverse employment action. . . . Once [defendants] have done so, the burden of production shifts back to [Clifford] to demonstrate the pretextual nature of the proffered reason." *Id.*

The parties agree that Clifford suffered an adverse employment action when he was demoted, but disagree as to whether Clifford can satisfy the remaining elements of his *prima*

---

[11] Clifford also alleges he was retaliated against in violation of the ADEA for complaining about Tenzer's age bias. In support of his ADEA retaliation claim, Clifford argues (1) that he engaged in protected activity when he complained to Schlueter in July 2006 about Tenzer's alleged age-biased remarks and (2) that Tenzer retaliated against his complaints by constructively discharging him. As Clifford does not identify any protected activity other than his conversation with Schlueter, he cannot show that his demotion, which occurred two months before the conversation, was a product of retaliation. Accordingly, the court grants summary judgment to defendants on Clifford's ADEA retaliation claim.

*facie* case and whether Clifford has presented sufficient evidence of pretext. Where, as here, "an employer has cited performance issues as the justification for its adverse action, the performance element of the prima facie case cannot be separated from the question whether the employer proffered a nonpretextual explanation for its challenged conduct." *Duncan* v. *Fleetwood Motor Homes of Ind., Inc.*, 518 F.3d 486, 491 (7th Cir. 2008) (citing *Peirick* v. *Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 687-88 (7th Cir. 2007); *Hague* v. *Thompson Distribution Co.*, 436 F.3d 816, 823 (7th Cir. 2006); *Coco* v. *Elmwood Care, Inc.*, 128 F.3d 1177, 1179 (7th Cir. 1997)). In such cases, "the second prong and the pretext question seemingly merge because the issue is the same – whether the employer is lying." *Hague*, 436 F.3d at 823. Because defendants' contend that Clifford's demotion was the result of poor performance and because Clifford argues that he did not perform poorly and that defendants' did not honestly believe that he performed poorly, the court will consider the second prong of Clifford's *prima facie* case along with the pretext question.

## A.     Protected Activity

Title VII makes it unlawful for a employer to retaliate against an employee who has opposed any practice that Title VII makes unlawful. 42 U.S.C. § 2000e-3(a). To demonstrate that he engaged in protected activity, therefore, Clifford must show that he complained about a type of discrimination that Title VII prohibits. He need not prove that the underlying conduct actually violated Title VII; he need only show that he had a "sincere and reasonable belief" that he was complaining about and thereby opposing an unlawful employment practice. *Magyar v. Saint Joseph Reg'l Med. Ctr.,* 544 F.3d 766, 771 (7th Cir. 2008) (quoting *Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc.,* 224 F.3d 701, 706 (7th Cir. 2000)). "The objective

reasonableness of the belief is not assessed by examining whether the conduct was persistent or severe enough to be unlawful, but merely whether it falls into the category of conduct prohibited by [Title VII]." *Id.* Even so, "[c]omplaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Tomanovich* v. *City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006). "Although an employee need not use the magic words 'sex' or 'gender discrimination' to bring [his] speech within Title VII retaliation protections, '[he] has to at least say something to indicate . . . [gender] is an issue.'" *Sitar v. Indiana Dep't of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003) (quoting *Miller* v. *Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1007-08 (7th Cir. 2000)).

Clifford argues that he engaged in activity protected under Title VII when he complained to Tenzer at the October 2005 convention and at the January 2006 sales meeting. Defendants argue that Clifford's complaints are not protected because he did not use the words "sexual harassment" or "sex discrimination" and because the conduct he complained of was not severe or pervasive enough to constitute sexual harassment. These arguments are without merit, however, because there are no "magic words" required to bring complaints within the protection of Title VII, *see Sitar*, 344 F.3d at 727, and because acts about which an individual complains need not actually violate Title VII for complaints themselves to be protected. *Magyar*, 544 F.3d at 771.

Defendants further argue that Clifford's complaints were not protected because they only reported in general terms Sproat's inappropriate behavior and only complained of harassment in a general sense. In his complaints to Tenzer, however, Clifford identified specific acts taken by Sproat, each of which was directed at one or more female employees, and each of which was of a type associated with sexual harassment or gender discrimination. Indeed, Clifford reported that

Sproat invited female employees to his hotel room at a work conference, which made them feel uncomfortable, followed a female employee into a restroom, and placed a finger in the mouth of another female employee. A reasonable person could construe these acts to be a series of unwelcome sexual advances. Because Clifford held a reasonable and honest belief that the acts about which he complained violated Title VII, he engaged in protected conduct when he complained to Tenzer about Sproat's behavior in October 2005 and in January 2006. As such, Clifford has established the first element of his *prima facie* case.

**B.      Similarly Situated Employees**

To be similarly situated, employees must be "directly comparable in all material respects." *Hudson* v. *City of Chi. Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004). Relevant factors include whether the employees reported to the same supervisor, were subject to the same standards, and possessed comparable qualifications. *Patterson* v. *Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). A similarly situated employee must also possess a "comparable set of failings" to the plaintiff. *Burks* v. *Wis. Dept. of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006). The similarly-situated requirement "is not an unyielding, inflexible requirement that requires near one-to-one mapping between employees – distinctions can always be found in . . . performance histories or the nature of the alleged transgressions." *Humphries* v. *CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007). Indeed, the inquiry is flexible and requires a court to "ask whether there are sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of . . . retaliation." *Id.*

Clifford argues that Cominsky, Brown, Scheuer, and Masterson were all similarly situated to him at the time of his demotion because, like Clifford, they all reported to Tenzer and were all criticized for poor gross profit growth in their regions. Clifford further argues that they were all treated more favorably because, unlike Clifford, none of them was demoted for their performance issues. Defendants argue that none of these individuals is similarly situated because none of them held a Vice President position or had a similar set of performance issues. Defendants also argue that neither Masterson nor Cominsky can be used as comparables because they each testified that they complained to Tenzer in January 2006 about Sproat's inappropriate behavior, just as Clifford did.

Scheuer and Brown are both directly comparable to Clifford. First, Scheuer and Brown, as a NAD and a Regional Director respectively, had similar responsibilities to Clifford at the time of his demotion. Indeed, the NAD and Regional Director positions, like the Vice President position, both involved some supervisory responsibility and some responsibility for the growth of product sales in a particular segment of Patterson Medical. Second, like Clifford, both Scheuer and Brown reported directly to Tenzer. Third, both individuals were criticized for performance issues similar to some of those for which Clifford was criticized at the time of his demotion. Specifically, Scheuer and Brown were both criticized for poor profit growth in a group for which they were responsible and both received "Needs Improvement" performance ratings from Tenzer in the "Executive Competencies" category. Accordingly, the court finds that Scheuer and Brown, neither of whom complained to Tenzer about Sproat's inappropriate behavior, were similarly situated to Clifford at the time of his demotion.[12] The commonalities

---

[12] Because the court finds that both Scheuer and Brown were similarly situated to Clifford at the time of his demotion, it need not decide whether Cominsky and Masterson, both of whom testified that they

between Clifford, Scheuer, and Brown, viewed in the context of Clifford's other *prima facie* evidence, would allow a reasonable jury to reach an inference of retaliation. *See Humphries*, 474 F.3d at 405. Accordingly, Clifford has satisfied the fourth prong of his *prima facie* case.

### C. Meeting Legitimate Expectations and Pretext

Defendants argue that Clifford's performance fell below Patterson Medical's legitimate expectations, and that for this reason, Clifford can neither satisfy the second prong of his prima facie case nor show that Tenzer's proffered reasons for his demotion – his poor performance – is a pretext for discrimination. Specifically, defendants claim that Clifford's demotion was based on four reasons, as articulated by Tenzer: (1) SSG performed poorly during the 2006 fiscal year; (2) Clifford had minimal impact on local dealers for potential acquisitions; (3) Clifford failed to put Hensley on a PIP despite Hensley's unsatisfactory performance; and (4) Clifford failed to hire a California-based Specialty Manager.

Because defendants have asserted these non-discriminatory justifications for Clifford's demotion, the burden now shifts to Clifford to put forth evidence sufficient to support a finding that each of Tenzer's proffered reasons was merely a pretext for retaliation. *See Adreani* v. *First Colonial Bankshares Corp.*, 154 F.3d 389, 395 (7th Cir.1998). A pretext is not a mere error, but a lie, a phony reason for the action. *Hudson* v. *Chi. Transit Auth.*, 375 F.3d 552, 562 (7th Cir. 2004). Thus, "[i]t is not enough for [Clifford] to simply assert that the acts for which [he] was terminated did not occur." *Billups* v. *Methodist Hosp.*, 922 F.2d 1300, 1304 (7th Cir. 1991). Instead, Clifford must cite evidence that demonstrates that Tenzer did not honestly believe that the events did occur. *Stewart* v. *Henderson*, 207 F.3d 374, 378 (7th Cir. 2000) ("The focus of a

complained to Tenzer in January 2006, were also valid comparables.

pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise or well-considered.").

To demonstrate pretext, Clifford must put forth evidence showing "(1) that the proffered reasons have no basis in fact, (2) that the proffered reasons did not actually motivate the termination, or (3) that they were insufficient to motivate the discharge." *Velasco* v. *Ill. Dep't of Human Servs.*, 246 F.3d 1010, 1017 (7th Cir. 2001). Clifford argues that the first and second reasons have no basis in fact and that the second, third, and fourth reasons did not actually motivate his demotion.

### 1.    SSG's Performance in the 2006 Fiscal Year

Defendants argue that Clifford failed to meet expectations because "Clifford was responsible for a group that had failing results" and further argue that as a result, Tenzer's first reason had a basis in fact. Defs.' Mot. for Summ. J. at 11-12. Specifically, defendants argue that because SSG's gross profit growth numbers during the 2006 fiscal year (April 2005 through April 2006) did not meet company-wide performance goals, Clifford did a poor job managing the group and facilitating sales growth.[13] By contrast, Clifford argues that SSG's performance was satisfactory. He notes that for the 2005 calendar year, three quarters of which is encompassed in the 2006 fiscal year, SSG's average gross profit growth was 5.5%. He acknowledges that this and the numbers cited by defendants are below company performance goals, but argues that SSG's failure to meet such goals is not conclusive evidence that Clifford performed poorly at the head of SSG. The fact that he was able to facilitate any growth in a

---

[13] Under Clifford's supervision, SSG posted the following gross profit growth results: 3.4% growth during the third quarter of 2005, -6.3% growth during the fourth quarter of 2005, -15.1% growth during the first of 2006. Company-wide gross profit growth goals varied by product line, ranging from 7.5% to 11%.

group described as the "ugly stepchild of [Patterson Medical's] sales organization," he argues, is evidence that he was at least meeting Patterson Medical's expectations. Donnelly Dep. 31:8. According to Clifford, he performed well because he "made a winner" out of SSG, an otherwise failing group. Pl.'s Resp. to Defs.' Mot. for Summ. J. at 9. Clifford also relies on the fact that both Tenzer and Donnelly expressed satisfaction with his performance as evidence that he was meeting expectations. Indeed, Donnelly testified that when he left Patterson Medical in September 2005, he "thought [Clifford] was doing a very, very good job [with SSG]" and "was very pleased with his performance." Donnelly Dep. 115:23-116:2. Also, in January 2006, Tenzer told Clifford that he believed "[SSG] was performing very well." Clifford Dep. 158:12.

The court finds that Clifford's evidence creates a genuine issue as to whether he met Patterson Medical's expectation that he grow SSG's product sales, and consequently, as to whether Tenzer's first reason had a basis in fact. While defendants are correct in stating that Clifford did not meet company growth goals, they ignore the undisputed fact that SSG was performing poorly when Clifford took over and do not provide any support for their contention that a failure to meet company-wide growth goals in such a situation is indicative of a failure to meet expectations. That Clifford was able to facilitate some profit growth for SSG is evidence that he was successful and working towards meeting company-wide expectations. Further, when considered along with the positive feedback from Tenzer and Donnelly, it could lead a reasonable jury to believe that Clifford met expectations regarding SSG sales.

Clifford further argues that regardless of whether SSG's performance during the 2006 fiscal year was poor, Tenzer did not actually believe that it was. He relies heavily on Tenzer's comment that in January 2006 that "[SSG] was performing very well," arguing that this

comment calls into question the honesty of Tenzer's belief. Tenzer Dep. 158:12. Defendants argue that this comment was taken out of context, and rely on Tenzer's testimony that while "[t]here may have been a portion of the performance of [SSG] that was doing well and [he] was pleased with," he "certainly wasn't pleased with the full year's performance of [SSG]." *Id.* 263:12-16. Tenzer's comment might lead a jury to doubt the honesty of his belief that SSG was performing poorly. Moreover, Tenzer's explanation, if true, does not necessarily discredit Clifford's theory that Tenzer did not actually rely on SSG's poor performance as a reason for his demotion. If Tenzer was pleased with a part of SSG's performance, it is not clear how he could have honestly believed that SSG's overall performance was poor enough to justify the demotion. Accordingly, the court finds that Clifford has proffered sufficient evidence to raise a genuine issue as to whether Tenzer honestly believed the first reason for Clifford's demotion and thus as to whether it was a pretext for retaliation.

### 2. Clifford's Participation in Dealer Acquisitions

Defendants next argue that Clifford failed to meet expectations because he had minimal impact on local dealers for potential acquisitions and further argue that, as a result, Tenzer's second reason had a basis in fact. They rely on Tenzer's testimony that when Sproat became president of Patterson Medical in October 2005, Sproat expressed concern that "very little work had been done" in the area of dealer acquisitions. Tenzer Dep. 208:6. They also rely on Tenzer's testimony that Joe Ruggierello, a contact for local dealer, Dale Professional Surgical, told him at some point that "little progress" had been made in his acquisition discussions with Clifford. *Id.* 283:19-20. Clifford disputes the validity of Tenzer's testimony, relying primarily on the fact that Tenzer admitted that neither he nor Sproat ever told Clifford that they were

dissatisfied with his work in the area of acquisitions. *See id.* 208:4-8. Clifford also produces

evidence demonstrating that he initiated acquisition discussions with two companies, the

aforementioned Dale Professional Surgical and Theraquip, both of which Patterson Medical later

acquired. *See* Donnelly Dep. 37:21-24, 41:1-2. Patterson Medical acquired Dale Professional

Surgical, which had $4 to $5 million in assets, in June 2006. It acquired Theraquip, which had

$10 million in assets, in December 2006. Tenzer testified that he was not sure of the extent of

Clifford's involvement with these acquisitions because Tenzer himself was not very involved in

either one.

The court finds that Clifford's evidence creates a genuine issue as to whether he was

meeting Patterson Medical's expectations regarding dealer acquisitions, and consequently, as to

whether Tenzer's second reason had a basis in fact. His work at the first stages of two major

acquisitions helped to facilitate the acquisition of nearly $15 million in new assets by Patterson

Medical, an impact that a reasonable jury could easily interpret as more than minimal.

Clifford further argues that Tenzer did not actually rely on Clifford's alleged failure to

make an impact in the area of dealer acquisitions as a reason for his demotion because Tenzer

never told Clifford that it was a reason for his demotion, either at the time of his demotion or at a

later date. Indeed, Clifford's performance in acquisitions was not brought to his attention until

after this litigation began. The court finds that these facts are sufficient to create a genuine issue

as to whether Tenzer actually relied on Clifford's performance in acquisitions as a reason for his

demotion and thus as to whether Tenzer's second reason was pretextual.

### 3.      Clifford's Failure to Put Hensley on a PIP

Clifford argues that Tenzer's demotion decision could not have been based on the fact that Clifford failed to put Hensley on a PIP because (1) Tenzer never told Clifford, in writing or otherwise, that he had to put Hensley on a PIP and (2) Tenzer never told Clifford that this was a reason for his demotion, either at the time of his demotion or at a later date. Indeed, Clifford's failure to put Hensley on a PIP was not brought to his attention until after this litigation began. Defendants, on the other hand, contend that Tenzer did tell Clifford that he needed to put Hensley on a PIP, and rely on Tenzer's testimony to that effect to support their contention. *See* Tenzer Dep. 275:20-24. They further argue that even if Tenzer did not directly instruct Clifford to put Hensley on a PIP, Clifford was aware that Hensley's performance was poor and should have taken remedial action. To establish notice, they rely on Clifford's April 2005 performance review, in which Tenzer expressed concern about Hensley's poor performance and Clifford's ineffective training of Hensley.

Clifford's evidence, considered in a light most favorable to him, creates a genuine issue as to whether he was required to put Hensley on a PIP, and consequently, as to whether Clifford failed to meet Patterson Medical's expectation that he do so. Indeed, defendants cannot maintain that Clifford failed to meet expectations by not putting Hensley on a PIP if such an expectation was not actually in place. Moreover, the fact that Tenzer never told Clifford that his demotion was based on his failure to put Hensley on a PIP, coupled with the fact that this justification surfaced for the first time in this litigation, creates doubt as to whether Tenzer actually relied on Clifford's failure as a reason for the demotion an thus as to whether this reason was a mere pretext for retaliation.

### 4.      Clifford's Failure to Hire a California-Based Sales Manager

Clifford similarly argues that Tenzer's demotion decision could not have been based on the fact that Clifford failed to hire a California-based manager because (1) Tenzer never told him, in writing or otherwise, to do so, (2) Tenzer actually discouraged him from hiring new managers, and (3) Tenzer never told him that his failure to hire a California-based manager was a reason for his demotion, either at the time of his demotion or at a later date. Further, Clifford's failure to hire a California based manager was not brought to his attention until after this litigation commenced. Defendants contend that Tenzer did tell Clifford that he needed to hire a California based manager, and rely on Tenzer's testimony to that effect to support their contention. Tenzer testified that he told Clifford that SSG "was not adequately aligned," that it was "doing very poorly in the state of California" and that Patterson Medical "would be better served to have a person in the state of California." Tenzer Dep. 275:24-176:4. Clifford denies that such a discussion ever took place.

Clifford's evidence, considered in a light most favorable to him, creates a genuine issue as to whether he was required to hire a California-based manager, and consequently, as to whether Clifford failed to meet Patterson Medical's expectation that he do so. Indeed, defendants cannot maintain that Clifford failed to meet expectations by not hiring a California-based manager if such an expectation was not actually in place. Moreover, the fact that Tenzer never told Clifford that his demotion was based [in part] on his failure to hire a California manager, coupled with the fact that this justification surfaced for the first time in this litigation, creates doubt as to whether Tenzer actually relied on Clifford's failure as a reason for the demotion.

Because Clifford has created a genuine issue as to whether Tenzer's proffered reasons were the actual reasons for Clifford's demotion, he has satisfied his burden to show pretext under the indirect method of proving retaliation. Accordingly, defendants' motion for summary judgment, as it pertains to Clifford's Title VII retaliation claim, is denied.

## IV.     Clifford's Motion for Summary Judgment on Defendants' Sixth and Tenth Affirmative Defenses

Clifford moves for summary judgment on defendants' sixth and tenth affirmative defenses. Defendants' sixth affirmative defense asserts that Clifford's complaint fails because the actions taken by defendants were in good faith, were reasonably necessary for the normal operation of business, and were based on legitimate, reasonable, and non-discriminatory and non-retaliatory reasons. Defendants' tenth affirmative defense asserts that Clifford is not entitled to punitive damages because defendants maintain and enforce a policy prohibiting discrimination and retaliation and because defendants make good faith efforts to prohibit discrimination in the workplace. Clifford argues that he is entitled to summary judgment on these defenses because they are not proper affirmative defenses under Fed. R. Civ. P. 8(c). *See Renalds* v. *S.R.G. Rest. Group LLC*, 119 F. Supp. 2d 800, 804 (N.D. Ill. 2000) (striking good faith affirmative defense because it was an "impermissible conclusory statement" and because "defendant [had] already put these matters in issue by denying certain allegations in its answer, and defendant not only need not but cannot raise these matters again via an affirmative defense."); *Kiswani* v. *Phoenix Sec. Agency, Inc.*, No. 05-c-4559, 2006 WL 463383, at *5 ("Assertions that punitive damages are not recoverable or constitutional do not constitute affirmative defenses under Section 8(c)."). Defendants respond that they have never represented either defense to be an affirmative defense, that they are both avoidances, as described in Fed. R. Civ. P. 8(c), or additional defenses under

38

Fed. R. Civ. P. 12(b).  *See* Fed. R. Civ. P. 12(b) ("Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required.").  Because defendants represent that they are not asserting the above arguments as affirmative defenses, Clifford's motion for summary judgment on them is moot.

## CONCLUSION AND ORDER

For the reasons explained above, defendants' motion for summary judgment [#63] is granted as to Clifford's ADEA retaliation claim and denied as to Clifford's age discrimination claim and Clifford's Title VII retaliation claim.  Clifford's motion for summary judgment [#60] is granted as to defendants' first and third affirmative defenses, denied as moot as to defendants' fourth, fifth, sixth, seventh, and tenth affirmative defenses, and denied as to the second, eighth, and ninth affirmative defenses.  The parties are directed to report for a status hearing on December 3,  2009 at  9:30 a.m.

Dated: November 18, 2009                    Enter:  _____

                                                     JOAN HUMPHREY LEFKOW
                                                     United States District Judge